936 F.2d 573
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James F. HAGER, Defendant-Appellant.
 No. 90-4110.
 United States Court of Appeals, Sixth Circuit.
 June 21, 1991.
 
 Before RALPH B. GUY, Jr. and RYAN, Circuit Judges, and JOINER, Senior District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 James F. Hager appeals his conviction for various crimes related to drug trafficking. The issues are 1) whether the district court's fact finding that Hager was competent to stand trial is clearly erroneous; and 2) whether the district court violated Hager's due process rights by finding Hager competent after a hearing in which the government allegedly called surprise witnesses.
 
 
 2
 Concluding that the district court did not commit clear error in finding Hager competent, and that the hearing met the requirements of due process, we affirm.
 
 I.
 
 3
 On December 19, 1985, a federal grand jury indicted Hager on various charges related to drug trafficking. According to the government, Hager eluded authorities until his arrest on April 24, 1989. In June 1989, Hager filed a motion requesting a determination of whether he was competent to stand trial in view of a skull injury he sustained that month. The district court ordered Hager to undergo psychological evaluation at a Springfield, Missouri, federal medical facility. After Hager arrived at the facility, another inmate struck him on the head with a mop handle. A staff psychologist reported that Hager was incompetent to stand trial, and the district court granted the parties' joint motion requesting the court to order a second evaluation at the facility. After the second evaluation, Dr. Donald Butts, M.D., a staff psychiatrist with at least fourteen years' experience in forensic psychiatry, reported that Hager remained incompetent to stand trial.
 
 
 4
 At the ensuing competency hearing, Dr. Butts testified that in evaluating Hager's mental condition, he considered the impressions of other center staff coming into contact with Hager, results of a neurological workup limited to physical pathology, the Halstead-Reitan battery of psychological tests, a separate battery of different psychological tests, an electroencephalogram, conclusions of a neurological consultant, a computerized axial tomography (CAT) brain scan, as well as Butts' own "mental status evaluation in serial installments, [25 to 30] serial interviews." According to Dr. Butts, Hager fell into the severely impaired range under the "state of the art" Halstead-Reitan test, which addresses "physical involvement involving psychological processes."
 
 
 5
 However, staff administered the Halstead-Reitan test, and perhaps several of the other tests, during Hager's first visit to the center, so that the test did not reflect any improvement occurring after Hager's first visit. An E.E.G. taken during the second visit produced normal results.
 
 
 6
 One of the brain scans taken on the first visit revealed "a left posterior parietal linear skull fracture with a contused brain, intracerebral hematoma, and a minor midline shift of brain structures, and a suggestion of mass effect." Dr. Butts explained:
 
 
 7
 [I]n a linear, i.e. a straight line on the left side of the skull, there is a fracture of the bone, and the underlining soft tissues were torn and contused and a large blood clot had developed as a result of a leaking ruptured vessel; and this, since the skull is a rigid unyielding container, the soft tissues, due to the incursion of the hematoma, the blood clot, the other soft tissues, were pushed out of the way into positions that were not anatomically correct, and it exerted pressure on the other brain structures.
 
 
 8
 * * *
 
 
 9
 * * *
 
 
 10
 It is by definition a brain injury.
 
 
 11
 While such brain injuries can cause a variety of physical symptoms, Hager suffered only a few of these symptoms. His physical symptoms included at least intermittent stuttering, staggering and unsteady gait, and overly tight muscles in his right arm and leg. According to Dr. Butts, it is "almost invariably true" that brain damage affecting physical functioning in this manner will also affect psychological functioning, because "the same area of the brain performs several functions." Dr. Butts described Hager as having no "demonstrated ability to pick up on abstract concepts, such as other than literal mean[ing]s of words." In Dr. Butts' view, Hager's symptoms were "classical ... textbook symptoms ... and believable." On the other hand, Butts knew that two individuals reported hearing Hager speaking on the telephone without stuttering.
 
 
 12
 Dr. Butts believed that Hager would not be able to "tend to the requirements of everyday living on his own." "[H]e might lack the cognitive ability [to] decide what was in his best interest at a critical moment, like not to cross the street in front of that truck...." On the issue of memory loss, Dr. Butts testified:
 
 
 13
 His memory is one of his principal demonstrated areas of pathology.... I divide memory into immediate, short-term, intermediate and chronic memory. His difficulties are in the more immediate memory, shorter term memory; his memory for things that happened a long time ago is relatively intact. Things that happen intermediately, for instance, like in the last six months or something like that, he's very spotty about that. He remembers some things; some things not at all. The short-term memory having to do with the past day or so, he has a lot of problems with; and the things that are immediate, like, for instance, "What did you have for breakfast at 7:00," may not be retained until evening.
 
 
 14
 So this is sort of a graduation. The shorter term, the more the loss, but things that were imprinted prior to the injury are still large largely there.
 
 
 15
 Addressing Hager's ability to function in a trial setting, Dr. Butts opined:
 
 
 16
 I have approached him, and others at our facility have an approached him on this and similar topics, and it is our opinion ... that he does not have the ability to follow through with that [listening to and comprehending testimony of others]. He does not have the ability to perform at that level.
 
 
 17
 .............................................................
 
 
 18
 ...................
 
 
 19
 * * *
 
 
 20
 [H]e would not do well; he would probably deteriorate on the stand. He knows the role and function of the major persons in the courtroom; but beyond that, loses the integrative qualification of what they do with each other. I think that were he on the witness stand, that you would see a person who was very halting in their cerebration; there would be a great delay in the procedures, to the point where you may not be able to proceed with the tempo of a court dynamic. I think that he would have to be led and positioned in order to even know where he was supposed to be at that point.
 
 
 21
 .............................................................
 
 
 22
 ...................
 
 
 23
 * * *
 
 
 24
 [H]is major concerns [in conferring with counsel] would probably be along the lines of circumstances of his physical comfort or lack of such in various facilities where he was incarcerated. [T]he sublties [sic] of the details of his charges would be accessible, nor the consequences of, the expected consequences of such.
 
 
 25
 .............................................................
 
 
 26
 ...................
 
 
 27
 * * *
 
 
 28
 I do not feel that he is competent to proceed....
 
 
 29
 According to Dr. Butts, Hager's condition had not significantly improved or deteriorated between the first and second evaluations. "[Y]ou might see a gradual betterment, but that's completely unpredictable." Acknowledging some possibility that Hager was "faking" his symptoms, Dr. Butts stated his belief that Hager's physical and psychological difficulties were genuine.
 
 
 30
 Hager's sister testified that Hager stuttered a great deal and that his thought processes were disjointed. However, another witness at the hearing, a United States Marshal, testified that Hager did not stutter for a short period of time during a trip from the medical facility to a Columbus, Ohio, jail. Scott Hansen, a mentally competent federal prisoner working as an orderly at the facility, testified that Hager deliberately stuttered only when a medical staff member or an inmate other than Hansen was present. Hansen also testified that he became friends with Hager, whom he saw on a daily basis, and that Hager revealed his intentions to convince Dr. Butts, and the rest of the medical staff, that he was incompetent to stand trial. According to Hansen, Hager requested Hansen to prompt him if he forgot to stutter, and Hager discussed staging a "seizure" in order to further convince the psychiatrists of his medical and/or psychological difficulties.
 
 
 31
 Hansen further testified that Hager claimed to have some gold and silver stored away, and that he periodically checked the library's Wall Street Journal for the most recent gold and silver prices. Hansen also recalled Hager's relating that he faced "enormous amounts" of prison time if convicted of charges relating to his distribution of marijuana transported from Arizona, Colorado, Texas, and Mexico. According to Hansen, Hager also stated that authorities had charged his wife with aiding and abetting the distribution, and that his brother-in-law was responsible for Hager's indictment. All this information concerning Hager's past and possible future proved accurate.
 
 
 32
 Hansen recalled that Hager correctly named the prosecuting attorney in his case and stated that he and his attorneys had her wrapped around their finger. According to Hansen, Hager also referred to his acquaintance, David Denner, who administered psychiatric rehabilitation programs for the Ohio Department of Mental Health. Hansen testified:
 
 
 33
 From what he told me, Mr. Denner, David Denner, is an ... official with the Mental Health Services for the State of Ohio, and that what his defense attorneys were going to try to do is get the Court to find Jim incompetent to stand trial, and try to move him into a state facility or a private facility, which if it was a state facility, David Denner could then have state doctors examine him and show that the injuries and that he had received were permanent injuries and that he could never--would never ever be able to stand trial, be competent to; and that, therefore, they would move for the Government to dismiss the charges that were against him.
 
 
 34
 Finally, Hansen recounted that Hager arranged for Denner to transfer $2500 of Hager's funds to Hansen, allegedly as a "loan" to enable Hansen to attend his mother's funeral in Toledo. Hansen never attended the funeral, and the center placed the funds in a commissary account for Hansen. He eventually spent the $2500 on commissary items, some of which may have been for Hager's benefit. Denner testified that he understood that the money was for the funeral of Hansen's father, not his mother. One of Hager's relatives sent Hansen $50.00, allegedly for a pair of gym shoes.
 
 
 35
 At the close of the hearing, the district court stated, I want counsel on both sides to submit a memorandum telling the Court what they have proved here this morning.... I'm going to tell you I am going to submit this defendant to further psychiatric examination. I will keep counsel well advised...." After the parties filed the requested memoranda, the district court issued an order declaring Hager competent to stand trial.
 
 
 36
 In the district court's view, Hager was "simply faking his condition" and stuttered "only when ... being observed." The court noted that Hager might be able to "control his stuttering, act as if his arm is impaired, and intentionally and selectively mislead others into believing he is experiencing memory loss." The court also asserted that objective tests demonstrated that Hager was improving and that his blood clot had dissolved. Of course, the court relied heavily upon Hansen's testimony in concluding that Hager fabricated symptoms in order to deceive Dr. Butts.
 
 
 37
 Hager appealed the district court's order declaring him competent, but the Sixth Circuit dismissed the appeal on the ground that the declaration was not a final appealable order. The parties then entered into a stipulation under which the government dismissed several counts of the indictment without prejudice. Following a bench trial, the district court found Hager guilty of the remaining counts. The court imposed a twelve-year sentence, two five-year sentences to run concurrently with the twelve-year sentence, and two years' supervised release.
 
 
 38
 Contending that he was incompetent to stand trial and that the government failed to provide adequate notice that it would call several lay witnesses at the competence hearing, Hager appeals.
 
 II.
 A.
 
 39
 Hager claims that mental and psychological complications resulting from his brain injury left him unable to effectively assist with his own defense at trial.
 
 
 40
 Subjecting a defendant to trial while the defendant is legally incompetent violates the defendant's due process rights. Drope v. Missouri, 420 U.S. 162, 171 (1974); Owens v. Sowders, 661 F.2d 584, 585 (6th Cir.1981); United States v. White, 887 F.2d 705, 708 (6th Cir.1989). The relevant inquiry is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as a factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402 (1960); Penry v. Lynaugh, 492 U.S. 302, 333 (1989). In other words, competence entails "the capacity to understand the nature and object of the proceedings ..., to consult with counsel, and to assist in preparing [a] defense...." Drope, 420 U.S. at 171. A federal district court's determination that a defendant is competent to stand trial is a finding of fact, which we review only for clear error. United States v. Shepard, 538 F.2d 107, 110 (6th Cir.1976); United States v. Sanzo, 842 F.2d 333 (6th Cir.1988) (unpublished decision).
 
 
 41
 The district court heard considerable evidence indicating that Hager, rather than muddling along as the confused victim of an unremitting cerebral impairment, artfully attempted to deceive Dr. Butts, the federal prosecutor, and the district court into believing that Hager was unable to effectively participate in trial proceedings. Hansen's testimony, plainly credited by the district court, indicated that Hager fabricated symptoms in order to convince the medical center staff that he suffered from physical and psychological impairments as a result of the June 1989 blow to his head. Hansen's testimony also indicated that Hager could both 1) anticipate the possibility of incarceration in his future, and 2) recall details of his criminal past, including his wife's and brother-in-law's roles.
 
 
 42
 Dr. Butts' testimony certainly tends to show that Hager sustained pronounced cerebral injury capable of causing the physical and severe psychological impairments that he appeared to exhibit. However, Dr. Butts' testimony also indicated that even victims of such pronounced injuries can recover, at least partially, over time. Moreover, the physical and psychological symptoms that Hager exhibited were susceptible of fabrication. A person can stutter, stagger, and stiffen his extremities at will, and Dr. Butts necessarily relied upon Hager's own self-serving assertions in determining that Hager suffered from confusion and memory loss. Thus Dr. Butts' testimony does not leave us with the firm conviction that the district court was mistaken in disagreeing with his assessment that Hager was legally incompetent.
 
 
 43
 Accordingly, we conclude that the district court's fact finding that Hager was competent to stand trial is not clearly erroneous.
 
 B.
 
 44
 Hager alleges that the district court violated due process by denying him a full and fair hearing concerning his alleged incompetence. Specifically, Hager complains that the government failed to give adequate notice of its intention to call the several lay witnesses who discredited Hager's appearance of incompetence. However, the record does not reveal that Hager either objected on these grounds at the hearing or requested a continuance.
 
 
 45
 The district court's prediction that the court would solicit and evaluate additional psychological evaluations does not excuse Hager's failure to object. If Hager wished to assemble and present additional evidence as rebuttal to the allegedly unexpected testimony of the government witnesses, he was free to provide or describe such evidence in the supplemental post-hearing memoranda that the district court consulted prior to rendering its final decision.
 
 
 46
 Thus, we conclude that absent contemporaneous objection, the district court's actions in relying upon the evidence adduced at the hearing and in the post-hearing memoranda did not offend due process.
 
 III.
 
 47
 For the foregoing reasons, Hager's conviction is AFFIRMED.
 
 
 
 *
 The Honorable Charles W. Joiner, Senior United States District Judge for the Eastern District of Michigan, sitting by designation